Filed 6/24/24  Gallegos v. Partners Personnel-Management Services CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

DOLORES GALLEGOS,

Plaintiff and Appellant,

v.

PARTNERS PERSONNEL-MANAGEMENT SERVICES LLC et al.,

Defendants and Respondents.

F086889

(Super. Ct. No. 22CECG03043)

**OPINION**

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi C. Kapetan, Judge.

Elkin Gamboa, Michael Elkin, Jessica Gamboa, Benjamin McLain and Elizabeth Tsolakyan; and Kyle Todd for Plaintiff and Appellant.

Medina McKelvey, Timothy B. Nelson and Kyle W. Owen, for Defendant and Respondent Partners Personnel-Management Services LLC, and Nexem Partners, LLC.

Littler Mendelson, Jason H. Borchers and Samuel O. Munson, for Defendant and Respondent Touchstone Pistachio Company LLC.

Plaintiff and appellant Dolores Gallegos appeals the trial court's ruling granting a motion to compel arbitration brought by defendant and respondent Partners Personnel-Management Services, LLC. Defendant Touchstone Pistachio Company, LLC also appears as respondent on appeal. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Partners Personnel-Management Services, LLC (Partners Personnel) is a national staffing company.[1] "As part of its business operations, Partners Personnel hires employees, or associates, and connects those associates with businesses, or clients, that are in need of temporary staff."[2] Dolores Gallegos was hired by Partners Personnel in August 2021 and assigned to work temporarily at Partners Personnel's client, Touchstone Pistachio Company, LLC (Touchstone), a commercial grower, processer, and distributor of pistachio nuts located in or near Fresno. Touchstone grows, processes, packages, and sells pistachios. With regard to sales, Touchstone sells nuts locally as well as throughout the country and around the world. "Partners Personnel's associates are responsible for sorting, stacking, boxing, and labeling the products that are delivered to customers."[3] "These staffing personnel have a direct impact on Touchstone's production process and

---

[1] Respondent Nexem Partners, LLC is also a named party in this action. Nexem Partners, LLC was a staffing company that was affiliated with Partners Personnel. Here, Partners Personnel refers to both Partners Personnel-Management Services, LLC and Nexem Partners, LLC.

[2] Declaration of Ashleigh Haddad, Branch Manager of the Fresno field office of Partners Personnel.

[3] Declaration of Ashleigh Haddad, Branch Manager of the Fresno field office of Partners Personnel.

2

the finished goods that are then placed in the stream of interstate commerce for consumption or resale by customers throughout the United States and abroad."[4]

When Gallegos was hired by Partners Personnel, she underwent on August 4, 2021, an onboarding process at Partners Personnel's Fresno office, during which she signed various documents, including a document entitled Mutual Agreement for Individual Arbitration (arbitration agreement). A client specialist for Partners Personnel declared, with respect to the arbitration agreement: "One phase of the onboarding program addresses the topic of arbitration. Within this independent category of the training program, associates are presented with an agreement to arbitrate any potential claims that may arise through their employment with Partners Personnel. The program explains to associates what arbitration means, and what it means if they sign the arbitration agreement. As with all aspects of the associate onboarding process, Partners Personnel staff, like me, are available to assist with questions and provide further explanation. There are also many Partners Personnel staff members that are fluent in the Spanish language that can assist Spanish-speaking associates when needed."

As noted above, Gallegos signed the arbitration agreement during her onboarding session. The arbitration agreement provided that Partners Personnel and Gallegos agreed to arbitrate any claims arising from Gallegos's employment with Partners Personnel. The arbitration agreement also contained a class action waiver as follows: "To the maximum extent permissible by law, arbitration shall proceed solely on an individual basis without the right for any claims to be arbitrated on a class, collective, representative, or group action basis or on bases involving claims brought in a purported representative capacity

---

[4] Declaration of Sherry Smiley, Chief Talent Officer of Assemi Group, Inc. and its affiliated companies, including Touchstone.

3

on behalf of others." The agreement specifies, in conclusion, that "[t]he company and employee both understand and agree that they are entering into this agreement voluntarily," and that by doing so their "disputes shall be resolved in individual arbitration." (Capitalization omitted.)

Partners Personnel assigned Gallegos to work at Touchstone's pistachio processing plant in Chowchilla. Gallegos worked there for approximately six weeks, from the end of August 2021 to early October 2021. The Chowchilla processing facility contained conveyer belt systems for processing and packing pistachios. Gallegos monitored the conveyor belts as they carried pistachios for packing. Gallegos described her duties in a declaration: "The pistachios I worked with at the Chowchilla facility were loaded, using a conveyer belt system, into large transport bags for distribution. I transported pistachios from one conveyer belt to another. If the pistachios fell off the conveyer belts, I put the pistachios back on the conveyer belts. I helped make sure the conveyer belts transported the pistachios into large transport bags. I regularly physically placed pistachios into the large transport bags. After the transport bags were filled, I observed that the large transport bags of pistachios were then loaded onto trucks and taken away from the factory."

On September 26, 2022, Gallegos filed a complaint initiating the instant action, a putative class action, on behalf of herself and other similarly situated workers. Gallegos's complaint alleged violations of the Labor Code's wage and hour provisions by Touchstone and Partners Personnel, including failure to pay wages, failure to provide meal and rest periods, failure to pay wages when due, and failure to provide accurate wage statements. Gallegos also sought relief under Business and Professions Code section 17200 et seq. (unfair business practices). On December 1, 2022, Gallegos filed a

first amended complaint that added a cause of action for civil penalties pursuant to the Private Attorneys General Act for the aforementioned Labor Code violations.

On February 10, 2023, Partners Personnel filed a motion to compel arbitration of Gallegos's claims on an individual basis under the terms of the arbitration agreement, and moved to dismiss her class claims pursuant to the class action waiver contained in the agreement. In other words, Partners Personnel sought to enforce, under the Federal Arbitration Act (FAA or the Act), the arbitration agreement Gallegos had signed when Partners Personnel hired her. Partners Personnel argued the FAA preempted otherwise applicable California law. Gallegos filed on July 12, 2023, an opposition to Partners Personnel's motion, primarily asserting that Gallegos was a transportation worker under Section 1 of the FAA and as such the arbitration agreement she signed was exempted from application of the FAA. Gallegos further contended, among other claims, that even if the FAA were applicable to the arbitration agreement, the arbitration agreement was unenforceable because it was unconscionable.

After a hearing on the matter, the trial court issued, on July 26, 2023, an order granting Partners Personnel's motion to compel arbitration of Gallegos's claims on an individual basis. The court ruled that a written arbitration agreement existed between the parties; the FAA governed the agreement because Gallegos was not a "transportation worker" within the meaning of Section 1 of the FAA; and once a single defective term was properly severed, the agreement was not unconscionable. Accordingly, the trial court ordered Gallegos to arbitrate her individual claims. The court also enforced the class action waiver contained in the arbitration agreement and dismissed Gallegos's class claims. Finally, the court stayed Gallegos's Private Attorneys General Act claims

5

pending resolution of her individual claims through arbitration proceedings. Gallegos appealed.

## DISCUSSION

**I.** **The Trial Court Properly Applied the FAA Because Gallegos Was Not A Transportation Worker Within the Meaning of Section 1 of the FAA**

### A. *Standard of Review*

"We review de novo the superior court's interpretation of an arbitration agreement, including whether federal or state law governing arbitration applies, when the interpretation does not involve conflicting extrinsic evidence." (*Nixon v. AmeriHome Mortgage Co., LLC* (2021) 67 Cal.App.5th 934, 946 (*Nixon*); see *Victrola 89, LLC v. Jaman Properties 8 LLC* (2020) 46 Cal.App.5th 337, 346; *Cortez v. Doty Bros. Equipment Co*. (2017) 15 Cal.App.5th 1, 12 ["We apply de novo review to the trial court's interpretation of an arbitration agreement that does not involve conflicting extrinsic evidence."].) We will independently review the trial court's determinations here, given there is no issue of conflicting extrinsic evidence relevant to interpretation of the arbitration agreement.

### B. *The Trial Court's Decision*

As noted, Gallegos contended in the trial court that the arbitration agreement was not subject to the FAA because she was an exempted transportation worker under section 1 of the FAA. After preliminarily finding that "there was a written agreement to arbitrate," the trial court ruled Gallegos had not established she was an exempted transportation worker and therefore the agreement was subject to the FAA. Specifically, the court ruled in pertinent part:

> "The FAA's mandate is to enforce arbitration. (*AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 344.) To ensure that arbitration

6

agreements are enforced according to their terms, the FAA preempts all state laws that apply of their own force to limit those agreements against the parties' will or to withdraw the power to enforce them. (*See e.g.*, *Perry v. Thomas* (1987) 482 U.S. 483, 490-491.) Labor Code section 229 unmistakably conflicts with the FAA, and must give way to the FAA if it applies. (*See id.* at p. 491.)

"Defendants submit that they assigned plaintiff to their client, defendant Touchstone Pistachio Company ("Touchstone"). [Citation.] Touchstone ships … product through the channels of interstate commerce throughout the United States and internationally. [Citation.] Defendants' associates are responsible for sorting, stacking, boxing, and labeling the products that are delivered to customers. [Citation.] Based on these statements, defendants submit that the arbitration agreement involves commerce as defined by the FAA. (9 U.S.C. § 2.)

"In opposition, plaintiff does not materially contest defendants' characterization of the work. Rather, plaintiff argues that those characteristics exempt the arbitration agreement from the FAA because though the work involves <u>interstate</u> commerce … [t]ransportation workers actively engaged in transportation are exempt from the FAA. (*Southwest Airlines Co. v. Saxon* (2022) [596 U.S. 450, 458; 9 U.S.C. § 1].)

"Though defendants concede that the personnel they submit to Touchstone sorts, stacks, boxes, and labels products that will be transported domestically and internationally, with a direct impact of placing finished goods in the stream of interstate commerce [citation], plaintiff declares that she merely transported and packed pistachios from conveyer to conveyer [citation]. While plaintiff placed pistachios into large transport bags, she merely observed the loading of those transport bags rather than 'doing the work' of the loading. (*Compare Southwest Airlines Co. v. Saxon*, *supra*, [596 U.S. at p. 458].) Based on the above, the court finds that the FAA preemption applies. Accordingly, Labor Code section 229 is preempted."

On appeal, Gallegos contends the trial court erred in ruling the FAA applied to the arbitration agreement because Gallegos was not an exempted transportation worker under the Act. Accordingly, the question before us is whether Gallegos was a transportation

7

worker within the meaning of Section 1 of the FAA. We conclude she was not a transportation worker under Section 1 of the FAA. Therefore, we affirm the trial court.

### C. Legal Framework: Who is a "Transportation Worker" Within the Meaning of The Residual Clause of Section 1 of the FAA (9 U.S.C. § 1) Under Saxon v. Southwest Airlines and Other Relevant Authorities

"The FAA was enacted in 1925, 43 Stat. 883, and then reenacted and codified in 1947 as Title 9 of the United States Code.… [I]ts 'purpose was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements on the same footing as other contracts.' " (*EEOC v. Waffle House, Inc*. (2002) 534 U.S. 279, 288-289 (*Waffle House*); *Circuit City Stores v. Adams* (2001) 532 U.S. 105, 111 (*Circuit City*) ["[T]he FAA[, which was enacted in light of] hostility of American courts to the enforcement of arbitration agreements … compels judicial enforcement of a wide range of written arbitration agreements."].)

The FAA provides that "an agreement in writing to submit to arbitration an existing controversy" arising out of a contract involving commerce "shall be valid, irrevocable, and enforceable." (9 U.S.C. § 2; *Bissonnette v. LePage Bakeries Park St., LLC* (2024) 601 U.S. 246, 250 (*Bissonnette*) ["The FAA provides generally that arbitration agreements are 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' "].) The United States Supreme Court has interpreted the FAA broadly to apply to "persons or activities" *affecting* interstate commerce. (*Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265, 273-274, 281.) The high court has also clarified that "[e]mployment contracts, except for those covering workers engaged in transportation, are covered by the [FAA]." (*Waffle House*, *supra*, 534 U.S. at p. 289.) When the FAA applies, it in turn preempts

8

Labor Code section 229's prohibition against mandatory arbitration of wage and hour claims.  (See, e.g., *Nixon, supra,* 67 Cal.App.5th at p. 947.)

The residual clause of 9 U.S.C. section 1 provides for an exception to the scope of the FAA; specifically it states:  "but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers *engaged in* foreign or interstate commerce."  (9 U.S.C. § 1, italics added; see, e.g., *Ortiz v. Randstad Inhouse Services, LLC* (2024 9th Cir.) 95 F.4th 1152, 1159 (*Ortiz*), quoting *Circuit City*, *supra*, 532 U.S. at p. 119 ["Though the FAA's pro-arbitration mandate is broad, its reach is not universal.  Section 1, for example, exempts [in its residual clause] the 'contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.' "].)  " 'In keeping with the FAA's policy favoring arbitration, the Supreme Court has construed the residual clause in § 1 narrowly, applying it only to 'contracts of employment of transportation workers.' " (*Ortiz*, at p. 1159.)

The United States Supreme Court addressed the scope of the residual clause of 9 U.S.C. section 1, in two recent cases, *Southwest Airlines Co. v. Saxon, supra,* 596 U.S. 450 (*Saxon*) and *Bissonnette*, *supra*, 601 U.S. 246.  In these cases, the Supreme Court restated its rationale for narrowly interpreting section 1 of the FAA:

> "More than twenty years ago, in *Circuit City Stores, Inc. v. Adams*[, *supra*, 532 U.S. 105], we recognized that § 1 is limited to transportation workers.  Adams, a sales counselor at an electronics store, claimed that § 1 exempts *all* contracts of employment, regardless of what a worker does.  [Citation.]  But he failed to account for *ejusdem generis*, the familiar canon of statutory interpretation that courts 'interpret a "general or collective term" at the end of a list of specific items in light of any "common attribute[s]" shared by the specific items.'  [Citation.]  Applying that canon to § 1, we explained that the general phrase 'class of workers engaged in … commerce' is 'controlled and defined by reference to' the specific categories 'seamen' and 'railroad employees' that precede it.

9

[Citation.] And we concluded that the 'linkage' between 'seamen' and 'railroad employees' is that they are both transportation workers. [Citation.] The class of workers in the residual clause was therefore limited in the same way." (*Bissonnette*, *supra*, [601 U.S. at pp. 252-253], citing, inter alia, *Saxon*, *supra*, 596 U.S. at p. 458; see *Wallace v. Grubhub Holdings, Inc*. (2020) 970 F.3d 798, 800-801 (*Wallace*) [in *Circuit City* "the Court explained that the phrase 'engaged in commerce' as used in § 1 meant something narrower than 'affecting commerce' or 'involving commerce' as used in § 2," in that "the phrase 'engaged in commerce' has 'a more limited reach,' [citation] … referring instead to 'active employment' in interstate commerce"].)

In addition, the Supreme Court noted: "[The narrow] reading of § 1 harmonized the FAA with other statutes designed to protect the movement of good in commerce. [Citation.] Congress enacted the FAA in 1925 to override the longstanding refusal of courts to enforce arbitration agreements. [Citation.] At that time, though, specific statutory dispute resolution regimes already covered seamen and railroad employees— 'transportation workers' who played a 'necessary role in the free flow of goods.' [Citation.] An exemption from the FAA for those workers was thus required to avoid 'unsettl[ing]' those schemes … while 'ensur[ing] that workers in general would be covered by' the FAA." (*Bissonnette*, *supra*, [601 U.S. at p. 253].) Recently, in *Bissonnette*, the high court definitively clarified that there was no requirement that "a transportation worker must work for a company in the transportation industry to be exempt under § 1 of the FAA." (*Bissonnette*, *supra*, [at p. 252].)

*Saxon* is most instructive for present purposes. In *Saxon*, the plaintiff Saxon, a ramp supervisor for Southwest Airlines at Chicago Midway International Airport, brought a putative class action against Southwest Airlines, which then sought to enforce its arbitration agreement with her under the FAA. Saxon argued she was an exempt transportation worker under the residual clause of section 1 of the FAA (the residual clause "exempts from the statute's ambit 'contracts of employment of seamen, railroad

10

employees, or any other class of workers engaged in foreign or interstate commerce' ").
(*Saxon*, *supra*, 596 U.S. at p. 454.)  The Supreme Court conducted a two-step analysis to resolve the question whether Saxon was an exempt transportation worker, stating:  "We begin by defining the relevant 'class of workers' to which Saxon belongs.  Then, we determine whether that class of workers is 'engaged in foreign or interstate commerce.' " (*Id*. at p. 455.)

The Court clarified that Saxon was "a member of a 'class of workers' based on *what she does* at Southwest, not what Southwest does generally."  (*Saxon*, *supra*, 596 U.S. at p. 456, italics added.)  The Court further determined that "Saxon belongs to a class of workers who physically load and unload cargo on and off airplanes on a frequent basis."  (*Ibid*.)  In the second step of the analysis, the Court considered whether "that class of airplane cargo loaders is 'engaged in foreign or interstate commerce' under § 1." (*Ibid*.)  The Court concluded "that it is."  (*Ibid*.)  Saxon was therefore exempted from the FAA's coverage.

*Saxon* elucidated the standards it applied in reaching its conclusion in step two of the analysis.  *Saxon* explained that "any class of workers directly involved in transporting goods across state or international borders falls within § 1's exemption," and "[a]irplane cargo loaders are such a class."  (*Saxon, supra*, 596 U.S. at p. 457.)  *Saxon*, quoting *Baltimore & Ohio Southwestern Railroad Co. v. Burtch* (1924) 263 U.S. 540, 544, observed:  "We have said it is 'too plain to require discussion that the loading or unloading of an interstate shipment by the employees of a carrier is so closely related to interstate transportation as to be practically a part of it.' "  (*Saxon*, *supra*, at p. 457.) *Saxon* further noted:  "We think it equally plain that airline employees who physically load and unload cargo on and off planes traveling in interstate commerce are, as a

practical matter, part of the interstate transportation of goods. They form 'a class of workers engaged in foreign or interstate commerce.' " (*Ibid*.) *Saxon* also pointed out that while the high court did not provide, in *Circuit City*, "a complete definition of 'transportation worker' " for purposes of section 1 of the FAA, it "indicated that any such worker must at least play a direct and 'necessary role in the free flow of goods' across borders." (*Id*. at p. 458.) *Saxon* added: "Put another way, transportation workers must be actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." (*Ibid*.)

*Saxon* concluded: "Cargo loaders exhibit this central feature of a transportation worker … [that is,] one who loads cargo on a plane bound for interstate transit is intimately involved with the commerce (e.g., transportation) of that cargo. '[T]here could be no doubt that [interstate] transportation [is] still in progress,' and that a worker is engaged in that transportation, when she is 'doing the work of unloading' or loading cargo from a vehicle carrying goods in interstate transit." (*Saxon*, *supra*, 596 U.S. at pp. 458-459.)

Along with *Saxon*, the parties here cite a recent Ninth Circuit case, *Ortiz.* The plaintiff there, Ortiz, worked for a staffing company, Randstad Inhouse Services, LLC (Randstad), that assigned him to work for GXO Logistics Supply Chain, Inc. (GXO). GXO operates warehouse and distribution facilities for Adidas and Ortiz worked at a California warehouse facility operated by GXO. (*Ortiz*, *supra*, 95 F.4th at p. 1157.) "The warehouse where Ortiz worked receives Adidas watches, apparel, and shoes from mostly international locations, including Asia, South America, and Central America. Products remain at the warehouse for anywhere from several days to a few weeks, after which they are shipped to end-use consumers and retailers in a variety of states." (*Ibid*.)

12

Ortiz's duties included picking up packages and transporting them to the warehouse racks to organize them, assisting pickers in obtaining packages so they could be shipped out, and assisting the Outflow Department to prepare packages for their subsequent shipment. (*Id*. at p. 1158.) Although Ortiz had signed an arbitration agreement with Randstad, he filed a class action against Randstad alleging various violations of California labor law. Randstad filed a motion to compel arbitration and Ortiz asserted the FAA did not apply because Ortiz qualified as an exempt "transportation worker." (*Ibid*.)

In the first step of the requisite analysis under *Saxon*, the *Ortiz* court recognized that Ortiz belonged to a class of warehouse workers who moved packages to and from storage racks, helped other employees obtain packages so they could be shipped, and assisted the Outflow Department to prepare packages for their subsequent shipment. (*Ortiz*, *supra*, 95 F.4th at p. 1161.) In the second step of the analysis, *Ortiz* concluded: "Like Saxon, Ortiz handled Adidas products near the very heart of their supply chain. In each case, the relevant goods were still moving in interstate commerce when the employee interacted with them, and each employee played a necessary part in facilitating their continued movement." (*Id*. at p. 1162.) "Saxon handled goods as they journeyed from terminal to plane, plane to plane, or plane to terminal, while Ortiz handled them as they went through the process of entering, temporarily occupying, and subsequently leaving the warehouse—a necessary step in their ongoing interstate journey to their final destination." (*Id*. at p. 1162.)

*Ortiz* cogently sums up *Saxon*'s central point: "Though the Court's different formulations of the [applicable] test—direct and necessary, active engagement, and intimate involvement—all vary slightly, *Saxon*'s bottom line is that to qualify as a transportation worker, an employee's relationship to the movement of goods must be

13

sufficiently close enough to conclude that his work plays a tangible and meaningful role in their *progress* through the channels of interstate commerce." (*Ortiz*, *supra*, 95 F.4th at p. 1160, italics added.) *Ortiz* points out: "*Saxon*'s reasoning … is consistent with the fundamental reality that within any given company, different classes of employees often have markedly different roles.… For example, under *Saxon*, a janitor would not qualify as a transportation worker even if he was employed by Southwest Airlines because his role is not direct or necessary to, actively engaged in, or intimately involved with transportation. [Citation.] On the other hand, a truck driver employed by a bakery or a temporary employee employed by a warehousing company might qualify despite the overarching nature of their employers' business because their particular job descriptions meet the standards laid out in *Saxon*." (*Id*. at p. 1165.) The key aspect of the analysis is that section 1 " 'directs the interpreter's attention to the *performance* of work.' " (*Ibid*.)

*Ortiz* reemphasized *Saxon*'s focus on the worker's role—even if purely localized—in the ongoing flow of goods across borders: "Ultimately, the Court held that Saxon met the interrelated standards it had just pronounced because 'when she is "doing the work of unloading" or loading cargo from a vehicle carrying goods in interstate transit,' 'there could be no doubt that *interstate transportation is still in progress*,' and that [Saxon] is engaged in that transportation.' " (*Ortiz*, *supra*, 95 F.4th at p. 1165, italics added.) *Ortiz* reasoned, with respect to the plaintiff, Ortiz, in that case: "If the same can be said of Ortiz, then under *Saxon*, he too qualifies as an exempt transportation worker." (*Id*. at p. 1160.) *Ortiz* concluded that Ortiz was a transportation worker under section 1 of the FAA (and as such was exempt from the FAA), because Ortiz's work occurred in the course of the ongoing flow of Adidas products through the channels of interstate commerce. The court observed: "Without employees like Ortiz, Adidas products that

14

arrived at GXO's warehouse would not be properly processed, organized, stored, or prepared for the next leg of their interstate journey."[5] (*Ortiz, supra*, 95 F.4th at p. 1163.)

Finally, it bears mention that in *Bissonnette*, the Supreme Court rejected the defendant employer's argument to the effect that, because " 'virtually all products move in interstate commerce' … virtually all workers who load or unload goods—from pet shop employees to grocery store clerks—will be exempt from arbitration." (*Bissonnette, supra*, 601 U.S. at p. 256.) *Bissonnette* stressed: "We have never understood § 1 to define the class of exempt workers in such limitless terms. To the contrary, as we held in *Saxon*, a transportation worker is one who is 'actively' ' "engaged in transportation" of … goods across borders via the channels of foreign or interstate commerce.' " (*Ibid*.) "In other words, any exempt worker 'must at least play a direct and "necessary role in the free flow of goods" across borders.' " (*Ibid*.) *Bissonnette* concluded: "These requirements 'undermine[] any attempt to give the provision a sweeping, open-ended construction,' instead limiting § 1 to its appropriately 'narrow' scope." (*Ibid*.)

### D. Analysis

Gallegos's work—which entailed packing or bagging the pistachios after they were processed—occurred at the end of the production line at Touchstone's Chowchilla facility. Applying *Saxon*, we conclude that Gallegos was part of a class of workers who packed and bagged the pistachios as they came off the production line at Touchstone's nut processing facility. As for the work performed by Gallegos and other members of the

---

[5] By stressing that Ortiz's work occurred in the course of the ongoing flow of Adidas products through the channels of interstate commerce*, Ortiz* distinguished that case from one "involv[ing] an employee who handles goods at or near the logistical end of an interstate or international supply chain," which presents more "thorny questions about when the interstate transport of goods ends and the purely intrastate transport of the same goods begins." (*Ortiz, supra*, 95 F.4th at p. 1161.)

15

class of workers to which she belonged, their work can fairly be characterized as end-of-the-production-line packing, packaging, and bagging work.

Gallegos's work is thus distinguishable from the work performed by Saxon and Ortiz. Saxon and Ortiz handled goods *as they moved through* the channels of interstate commerce. In contrast, Gallegos packed and packaged processed pistachios in the very facility in which they were processed—*before* they entered the stream of interstate commerce. (See *Wallace*, *supra*, 970 F.3d at p. 802 [to trigger exemption of section 1 of FAA, "a class of workers must themselves be 'engaged *in the channels* of foreign or interstate commerce' "].) Bagging the pistachios amounts to the culmination of or final step in, the production process, and is fully performed in advance of the interstate transportation process. The work performed by Gallegos does not *directly* launch the pistachios into interstate commerce, nor does it *necessarily* propel the pistachios through the channels of interstate commerce.

While the question is closer than it would be had Gallegos worked as, say, a janitor or security guard at Touchstone, in the end the class of workers to which Gallegos belonged cannot be said to be "actively engaged in" or "intimately involved with" the interstate transport of the pistachios. (*Wallace*, *supra*, 970 F.3d at p. 801 ["Both we and our sister circuits have repeatedly emphasized that transportation workers are those who are 'actually engaged in the movement of goods in interstate commerce.' "].) On the contrary, packing pistachios on an assembly line is part of the chain of assembly or preparation of good for distribution, sale, and consumption. Hence, the class of workers relevant here is more akin to production-line workers than transportation workers. (*Saxon*, *supra*, 596 U.S. at p. 462 [fact that activity at issue may be " 'perceptibly connected to … instrumentalities' of interstate commerce [is] not enough"; the activity

16

must be " 'within the flow of interstate commerce' "]; *Wallace*, *supra*, 970 F.3d at p. 801 ["residual clause … exempts only workers who are akin to seamen and railroad employees"].)

We conclude that Gallegos was not a transportation worker within the meaning of the residual clause of section 1 of the FAA. Accordingly, she does not fall within the exemption from the FAA provided by section 1 of the Act. The FAA applies to the arbitration agreement Gallegos signed when she was hired by Partners Personnel. We therefore affirm the trial court's ruling to this effect.

## II.     The Arbitration Agreement Was Not Unconscionable

Gallegos next argues the trial court erred in enforcing the arbitration agreement because the agreement was both procedurally and substantively unconscionable and was therefore invalid and unenforceable. We disagree and affirm the trial court's ruling.

### A.     *Standard of Review*

In the absence of meaningful factual disputes, the question of unconscionability of an arbitration agreement is reviewed de novo. (*Lhotka v. Geographic Expeditions, Inc*. (2010) 181 Cal.App.4th 816, 820.) The trial court's ruling on severance of a provision in an arbitration agreement is reviewed for abuse of discretion. (*Id*. at pp. 820-821.)

### B.     *Trial Court's Ruling*

The trial court ruled on Gallegos's unconscionability challenge as follows (the footnote that appears in the following excerpt is in the original):

> "If the court finds as a matter of law that a contract or any portion of it was unconscionable at the time it was made, the court may refuse to enforce it, or may enforce the contract without the unconscionable provisions, or limit their application to avoid any unconscionable result. (Civ. Code[,] § 1670.5, subd. (a).) There are two prongs considered in this analysis: procedural unconscionability and substantive unconscionability. Both must be present for a court to exercise its discretion to refuse to

17

enforce an arbitration agreement under the doctrine of unconscionability. (*Armendariz v. Foundation Health Psychcare Services, Inc*. (2000) 24 Cal.4th 83, 113.) They need not be present in equal amounts; essentially a sliding scale is used, and where there is substantive unconscionability, less procedural unconscionability need be shown. (*Id*. at pp. 113-114.)

"Plaintiff argues that the arbitration agreement is procedurally unconscionable because the arbitration agreement is a contract of adhesion. Plaintiff was provided the arbitration agreement as a take-it-or-leave-it basis.

"A contract of adhesion is one imposed and drafted by the party of superior bargaining strength, and relegates to the subscribing party only the opportunity to adhere to the contract or reject it. (*Mission Viejo Emergency Medical Associates v. Beta Healthcare Group* (2011) 197 Cal.App.4th 1146, 1159.) Adhesion does not *per se* render the arbitration agreement unenforceable, since such contracts 'are an inevitable fact of life for all citizens, businessman and consumer alike.' (*Graham v. Scissor-Tail, Inc*. (1981) 28 Cal.3d 807, 817-818.) A finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided. (*Baltazar v. Forever 21, Inc*. (2016) 62 Cal.4th 1237, 1244.)[6] In other words, there must also be substantive unconscionability. (*Armendariz*, *supra*, 24 Cal.4th at p. 114.)

"The substantive inquiry considers whether the overall bargain is overly harsh or unreasonably one sided. (*Armendariz*, *supra*, 24 Cal.4th at p. 114.) California courts have stated the standard variously, defining it as, for example: so one sided as to shock the conscience (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 246); unduly oppressive (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 925); and unfairly one-sided (*Little v. Auto Stiegler, Inc*. (2003) 29 Cal.4th 1064, 1071). The California Supreme Court has acknowledged these variations and has clarified the differing formulations mean the same thing. (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 911.)

---

[6] "Plaintiff's further argument that the arbitral forum's rules were not provided does not aid plaintiff. Plaintiff makes no explanation as to how the arbitration rules 'artfully hides' some substantively unconscionable term of which she was unaware, as discussed below. (See *Balthazar*, *supra*, 62 Cal.4th at p. 1246.)" (Fn. in original.)

"In the employment context specifically, to avoid a finding of substantive unconscionability, the agreement must include the following five minimum requirements designed to provide necessary safeguards to protect unwaivable statutory rights where important public polices are implicated: 1) a neutral arbitrator; 2) adequate discovery; 3) a written, reasoned, opinion from the arbitrator; 4) identical types of relief as available in a judicial forum; and 5) that undue costs of arbitration will not be placed on the employee. (*Armendariz*, *supra*, 24 Cal.4th at p. 102.)

"Plaintiff argues that the arbitration agreement is substantively unconscionable as unfairly one-sided because the agreement allows for the severe limitation of discovery. However, [adequate] discovery does not mean unfettered discovery. (*Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 184.) The arbitration agreement affords the parties reasonable discovery, as may be limited by the arbitrator. [Citation.] Such a provision is sufficient to satisfy the adequate discovery factor. (See *Roman v. Superior Court* (2009) 172 Cal.App.4th 1462, 1475-1476.)

"Plaintiff further argues that the agreement is substantively unconscionable because unlike defendants, plaintiff could not seek civil remedies [for] criminal misconduct under the arbitration agreement. It would appear that the arbitration agreement limits plaintiff's ability to pursue remedies for any criminal wrongdoing she may discover against the employer, which would be unfairly one-sided.

"Defendants offer that any portion found to be substantively unconscionable be severed. The arbitration agreement provides for severability. [Citation.] Further, courts have the capacity to cure an unlawful contract through severance or restriction of the offending clause. (*Armendariz*, *supra*, 24 Cal.4th at pp. 123-124.) Courts look to the various purposes of the contract; if the central purpose is tainted with illegality, then the contract as a whole cannot be enforced. (*Id.* at p. 124.) If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract, then severance and restriction is appropriate.

"This singular defect does not appear to affect the main purpose of the agreement, which is [to] arbitrate all disputes that arise out of plaintiff's <u>employment relationship</u>, including both the claims defendants may have against plaintiff, and the claims plaintiff may have against defendants and

19

its affiliates and clients. [Citation.] Plaintiff does not argue that criminal conduct is related, or was anticipated to be related, to her employment relationship with defendants. The court finds that the arbitration agreement is in any event curable through severance of that provision.

"Having severed the singular [defective] provision, the court finds that the arbitration agreement is not so unconscionable as to be unenforceable."

### C.      Analysis

In order to prevail on unconscionability, Gallegos must show both "procedural" and "substantive" unconscionability. (*Armendariz*, *supra*, 24 Cal. 4th at p. 114.)

Substantive unconscionability " 'pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.' " (*The McCaffrey Group, Inc. v. Superior Court* (2014) 224 Cal.App.4th 1330, 1349 (*McCaffrey*).) Because "[c]ommerce depends on the enforceability, in most instances, of a duly executed written contract[,] [a] party cannot avoid a contractual obligation merely by complaining that the deal, in retrospect, was unfair or a bad bargain." (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 911.) Instead, a contract term must be " ' " ' "*overly* harsh [citation]" ' " ', " '*unduly* oppressive' " [citation], " 'so one-sided as to "shock the conscience" ' " [citation], or "unfairly one-sided [citation]." ' " (*Id.* at pp. 910-911.) " 'All of these formulations point to the central idea that unconscionability doctrine is concerned not with "a simple old-fashioned bad bargain" [citation], but with terms that are "unreasonably favorable to the more powerful party [citation]." ' " (*Id.* at p. 911.) Moreover, " '[i]f the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract,' " then the defective provision may be severed. (*Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 996; accord *Baeza v. Superior Court* (2011) 201 Cal.App.4th 1214, 1230.)

20

Gallegos posits the arbitration agreement was substantively unconscionable for two reasons:  (1) it contains unilateral carveouts that benefit Partners Personnel, and (2) it allows the arbitrator to limit discovery.  We agree with the trial court that the disputed terms do not render the arbitration agreement unconscionable.

**(i)      The Arbitration Agreement Is Not Rendered Substantively Unconscionable By The Ostensible Unilateral Carveouts Identified By Gallegos**

With regard to her argument that the arbitration agreement contains unilateral carveouts in favor of Partners Personnel, Gallegos focuses on the last sentence/provision in paragraph 2 of the agreement (paragraph 2 is entitled, "Claims Not Covered by This Agreement").  Paragraph 2 of the agreement provides:  "The following Claims are not subject to arbitration under this Agreement:  (1) claims for workers' compensation benefits, state disability benefits, state unemployment benefits, including but not limited to the Company's profit sharing and 401(k) Plan; (2) administrative charges filed with a federal, state, or local government office or agency, such as the Equal Employment Opportunity Commission ("EEOC") or the National Labor Relations Board ("NLRB"); (3) a judicial action by either party for a temporary restraining order or a preliminary injunction pending arbitration; and (4) any claims that, as a matter of law, cannot legally be subject to arbitration.  *This Agreement also does not limit the Company's ability to report and pursue remedies for any criminal wrongdoing it may discover against Employee.*"  (Italics added.)

Gallegos focuses on the last sentence of paragraph 2 (italicized above).  She argues it lacks mutuality and thereby renders the arbitration agreement unconscionable. When viewed in isolation, the disputed sentence appears to be a unilateral carveout in favor of Partners Personnel insofar as it permits Partners Personnel to report and pursue

21

remedies for any potential criminal wrongdoing committed by its employees without reciprocally permitting employees to do the same with respect to criminal wrongdoing by the company. However, paragraph 2 also exempts from arbitration employees' claims for workers' compensation, state disability benefits, and state unemployment benefits as well as employee claims filed with "a federal, state, or local government office or agency" (for example, claims for wage theft and other law violations). Thus, paragraph 2 permits employees to report law violations by the company to government agencies and benefit from any adverse findings rendered against the company, and it permits the company to report and pursue remedies for criminal wrongdoing by employees.

When paragraph 2 is considered as a whole, despite some imbalance, it does not render the arbitration agreement unconscionable as so one sided as to shock the conscience. (Cf. *Ramirez v. Charter Communications, Inc*. (2022) 75 Cal.App.5th 365, 382 (*Ramirez*) ["An agreement may be unfairly one-sided if it compels arbitration of the claims more likely to be brought by the weaker party but exempts from arbitration the types of claims that are more likely to be brought by the stronger party."]; see *Davis v. Kozak* (2020) 53 Cal.App.5th 897, 910 [" 'Agreements to arbitrate must contain at least " 'a modicum of bilaterality' " to avoid unconscionability.' "].)

Gallegos also argues that the following provision in paragraph 6 unfairly targets only employees: "The Parties agree and understand that any relief or recovery to which Employee is entitled from any Claims arising out of Employee's employment or cessation of employment shall be limited to that awarded by the arbitrator." However, paragraph 6 is not unfair as it also unequivocally states, with respect to both Partners Personnel and its employees, that "[a]ny relief or recovery shall by limited to that

22

awarded by the arbitrator." In short, the agreement makes clear that both parties are equally bound by the arbitrator's award.

### (ii) Reasonable Discovery Limitations Do Not Render the Arbitration Agreement Substantively Unconscionable

Paragraph 6 of the arbitration agreement provides: "The parties shall be entitled to engage in reasonable discovery, *as may be limited by the arbitrator*, in the forms of requests for documents, interrogatories, requests for admission, physical and/or mental examinations and depositions, in order to obtain information to prosecute or defend the claims brought." (Italics added.) Gallegos contends the italicized phrase in the above provision renders the arbitration agreement substantively unconscionable. We reject this contention.

Specifically, Gallegos argues: "The language in the Arbitration Agreement does not articulate specific limitations on discovery. Instead, the language is ambiguous and may be read to grant an arbitrator *carte blanche* authority to place as many limits on discovery as they desire. Because an arbitrator could use this language to impose severe or total limits on discovery, the Arbitration agreement … is substantively unconscionable." Gallegos argues the "potential discovery limitations" in the arbitration agreement impair her ability "to vindicate her rights" and "at the very least compound the one-sidedness of the Arbitration Agreement."

"A limitation on discovery is an important way in which arbitration can provide a simplified and streamlined procedure for the resolution of disputes." (*Davis v. Kozak*, *supra*, 53 Cal.App.5th at p. 910.) "At the same time, '[a]dequate discovery is indispensable for the vindication of statutory claims.' " (*Ibid*.) "In this context, 'adequate' does not mean 'unfettered.' " (*Ibid*.) "We assume, as we must, that any

23

selected arbitrator will operate in a reasonable manner in conformity with the law." (*Id.* at p. 914.)

Here, the arbitration agreement entitles the parties to conduct "reasonable discovery." And the AAA Employment Arbitration Rules and Mediation Procedures, which are referenced in the arbitration agreement, state that "discovery parameters" will be established at the arbitration management conference, and that the arbitrator shall have the authority to order discovery, "by way of deposition, interrogatory, document production, or otherwise," that is "necessary to a full and fair exploration of the issues in dispute." Speculation aside, Gallegos has not established how paragraph 6's "reasonable discovery" provision hinders her ability to fairly arbitrate her claims.

### (iii) There Is No Appreciable Procedural Unconscionability

Procedural unconscionability examines "whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required." (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 126 (*OTO*). ) Oppression " ' " 'involves lack of negotiation and meaningful choice,' " ' " while surprise involves hiding unconscionable provisions " ' " 'within a prolix printed form.' " ' " (*Ibid.*)

Gallegos argues that procedural unconscionability exists because (1) the agreement was a contract of adhesion and presented in an oppressive manner; and (2) because she could not review the AAA rules in Spanish. We reject these contentions.

First, the record does not indicate that Gallegos was subjected to oppression in signing the agreement. The agreement specifies that entering into the agreement was voluntary. In addition, the agreement states that should an employee elect "not to sign this Agreement, no adverse employment action would be taken against Employee by the

24

Company." Gallegos had the option of declining to sign the agreement but chose instead to sign it.

Gallegos also asserts she felt rushed when going through the arbitration agreement because the computer she used to do so had a timer or countdown clock that automatically advanced the materials she was viewing. However, these assertions are belied by the record. The record reveals that associates are not timed during the arbitration phase of the onboarding process. Cindy Sanchez, a client specialist for Partners Personnel, declared: "[Only] one phase of the onboarding program … that contains a clock that records how long it takes each associate to complete that phase of the program. That phase pertains to the topic of sexual harassment. The timer is necessary because under state law, employees are required to complete at least one hour of sexual harassment training every two years. The program records associates' time to make sure that they're spending at least one hour during the sexual harassment training, *not to make them complete the training faster*. Also, if an associate decides to complete the sexual harassment training over several sessions, which they are allowed to do, the time recording feature tracks the total amount of time spent in the training over the course of several sessions. There is no other phase of the associate onboarding process that involves a timer or clock." (Italics added.)

Gallegos's additional argument that Partners Personnel's failure to attach to the arbitration agreement, a Spanish translation of the applicable AAA rules rendered the arbitration agreement procedurally unconscionable, is also unavailing. The arbitration agreement specifies: "The arbitration shall be conducted by a single neutral arbitrator in accordance with the then-current Employment Arbitration [Rules] and Mediation Procedures of the American Arbitration Association ("AAA"), which can be viewed at

http://www.adr.org/employment. Employee may obtain a copy of these rules upon request." Gallegos complains that the specified website provides the applicable rules in English only. However, Gallegos's declaration does not state she attempted to access the rules online, requested that an interpreter translate the rules from English to Spanish, or asked for a Spanish-language copy of the rules. Nor does Gallegos contend she would not have signed the agreement had she timely reviewed the rules.

We conclude Gallegos has not established procedural unconscionability on the ground that a Spanish translation of the applicable AAA rules was not attached to the arbitration agreement. (See *Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 180 [no unconscionability where plaintiff was informed she could obtain copy of AAA rules from human resources or AAA website]; *Lane v. Francis Capital Management LLC* (2014) 224 Cal.App.4th 676, 691 [failure to attach rule did not create surprise and was not procedurally unconscionable because rules were accessible on internet]; *Peng. v. First Republic Bank* (2013) 219 Cal.App.4th 1462, 1472 [where plaintiff does not "identify any feature of the AAA rules that prevent fair and full arbitration," the "failure to attach the AAA rules … is insufficient grounds to support a finding of procedural unconscionability"]; *Baltazar v. Forever 21, Inc*. (2016) 62 Cal.4th 1237, 1246 [plaintiff's complaint that employer did not attach applicable AAA rules for arbitration of employment disputes lacked force where her challenge to enforcement of the agreement had "nothing to do with the AAA rules"].)

Finally, Gallegos's argument that the arbitration agreement was infected with procedural unconscionability because it was a contract of adhesion, also fails. "When, as here, there is no other indication of oppression or surprise, 'the degree of procedural unconscionability of an adhesion agreement is low, and the agreement will be

26

enforceable unless the degree of substantive unconscionability is high.' " (*Serpa v. California Surety Investigations, Inc*. (2013) 215 Cal.App.4th 695, 704; *Ramirez*, *supra*, 75 Cal.App.5th at p. 373 [" 'the fact that the arbitration agreement is an adhesion contract does not render it automatically unenforceable as unconscionable' "]; accord *McCaffrey*, *supra*, 224 Cal.App.4th at p. 1349.)

### (iv) The Arbitration Agreement Was Not Invalid On Grounds of Unconscionability

In sum, an unconscionability finding must be supported by substantive *and* procedural unconscionability. (*Armendariz*, *supra*, 24 Cal.4th at p. 114.) The party asserting unconscionability bears the burden of proving that *both* exist to some degree. (*OTO*, *supra*, 8 Cal.5th at p. 129.) Here, Gallegos has not established the existence of *either* substantive or procedural unconscionability.

### DISPOSITION

The judgment is affirmed. Respondents are awarded costs on appeal.


SMITH, J.

WE CONCUR:


LEVY, Acting P. J.


DETJEN, J.

27